| | | |
|---|---|---|
| **JACKIE E. WADDELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:08CV 96 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Jackie E. Waddell for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 19). Defendant has filed a Brief in Support of the Answer. (Doc. No. 22).

## Procedural History

On July 7, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on August 1, 2003. (Tr. 67-69). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 13, 2007. (Tr. 19-20, 10-18). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on May 13, 2008. (Tr. 7, 3-6). Thus, the

- 1 -

decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on November 13, 2006.  (Tr. 455).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Susan Shea.  (Id.).  The ALJ began the hearing by admitting the exhibits into the record.  (Id.).

The ALJ then examined plaintiff, who testified that she lived with her husband and her fifteen-year-old son.  (Tr. 457).  Plaintiff stated that her husband was not employed.  (Id.).  Plaintiff testified that she has never had a driver's license.  (Id.).  Plaintiff stated that her only source of income was her husband's SSI benefits and the child support she receives for her son. (Id.).  Plaintiff testified that her husband is disabled due to a back injury sustained in an automobile accident.  (Id.).  Plaintiff stated that her husband is able to do most things himself, although she prepares her husband's meals and pays the bills.  (Id.).

Plaintiff testified that she graduated from high school and attended two years of vocational school.  (Tr. 458).  Plaintiff stated that she received a certificate in data processing from the vocational school.  (Id.).  Plaintiff testified that she last worked in 1996 or 1997 as a nurse's aide at a nursing home.  (Id.).  Plaintiff stated that she worked at this position for about two months. (Id.).  Plaintiff testified that prior to working as a nurse's aide, she worked at Harper Head Start as a substitute cook for about two months.  (Id.).  Plaintiff stated that she has not worked at any other positions.  (Id.).

Plaintiff testified that she is unable to work because she suffers from migraines, carpal

tunnel syndrome,[1] problems with her back, and problems with her legs. (Tr. 453). Plaintiff stated that one of her legs bends the wrong way, the other leg locks, and she experiences a stabbing pain in her knees. (Id.). Plaintiff testified that she has been experiencing these difficulties since about 1998, after she was involved in an automobile accident. (Id.). Plaintiff stated that, since 2002, she has been experiencing pain in her lower and upper back, which makes it difficult to sit or stand for long periods. (Id.).

Plaintiff testified that she suffers from carpel tunnel syndrome, which causes her to experience pain in her wrists that shoots down her fingers and makes her hands go numb. (Id.). Plaintiff stated that she underwent surgery for the carpal tunnel syndrome, but it did not improve her symptoms. (Tr. 460). Plaintiff testified that she experiences these symptoms about ninety percent of the time, regardless of whether she is engaging in any activity. (Id.).

Plaintiff stated that she experienced migraine headaches three times a day until she began getting shots. (Id.). Plaintiff testified that, at the time of the hearing, she experienced migraines about twice a week. (Id.).

Plaintiff stated that she received Medicaid benefits. (Id.).

Plaintiff testified that the medication list she provided was accurate. (Id.). Plaintiff stated

---

[1]The most common nerve entrapment syndrome, characterized by paresthesias, typically nocturnal, and sometimes a sensory loss and wasting in the median nerve distribution in the hand. Stedman's Medical Dictionary, 1892 (28th Ed. 2006).

that, at the time of the hearing, she was taking Norvasc,[2] Lisinopril,[3] Tizanidine,[4] Levoxyl,[5] Naproxen,[6] Darvocet,[7] and Gabapentin.[8]  (Tr. 460-61).  Plaintiff stated that her medications were all prescribed by Dr. Lance Monroe.  (Tr. 461).  Plaintiff testified that her medications make her tired.  (Id.).  Plaintiff stated that she has discussed this side effect with Dr. Monroe and that Dr. Monroe has not adjusted her medications.  (Id.).

Plaintiff testified that she has never smoked cigarettes.  (Tr. 462).  The ALJ stated that a note in the medical record indicated that plaintiff smoked one-half a package of cigarettes a day. (Id.).  Plaintiff stated that she has never smoked cigarettes at all.  (Id.).

Plaintiff testified that she was five-feet-nine-inches tall and weighed about 200 pounds. (Id.).  Plaintiff stated that she was right-hand dominant.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that her carpal tunnel syndrome pain increases when she writes or cooks.  (Tr. 462-63).  Plaintiff stated that, when she has a migraine, she experiences a shooting pain up the back of her neck in both sides and into the front of her head.  (Tr. 463).  Plaintiff testified that she has to be in a completely quiet and dark room

---

[2]Norvasc is indicated for the treatment of hypertension.  See Physician's Desk Reference (PDR), 2621 (63rd Ed. 2009).

[3]Lisinopril is indicated for the treatment of hypertension.  See PDR at 2124.

[4]Tizanidine is a muscle relaxer indicated for the treatment of muscle spasms.  See PDR at 2578.

[5]Levoxyl is indicated for the treatment of hypothyroidism.  See PDR at 1785.

[6]Naproxen is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis.  See PDR at 2874-75.

[7]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 402.

[8]Gabapentin is indicated for the treatment of postherpetic neuralgia.  See PDR at 2590.

for a couple hours when she has a migraine.  (Id.).  Plaintiff stated that she takes Darvocet at the onset of a migraine and then naps for a couple hours.  (Id.).  Plaintiff testified that the Darvocet makes her sleep.  (Id.).

Plaintiff stated that she also has a shoulder problem.  (Tr. 464).  Plaintiff testified that she injured her left shoulder in June or July of 2006 when she was holding the leash of her sister's dog and the dog pulled her arm backwards around a chair.  (Id.).  Plaintiff stated that she experiences shooting pain in her shoulder blade and she is unable to lift her arm.  (Id.).  Plaintiff testified that her pain is primarily in her left shoulder, although she experiences some pain in her right shoulder as well.  (Id.).  Plaintiff stated that her doctor told her that her pain is probably caused by bursitis[9] or tendonitis,[10] although he was unable to determine the exact cause.  (Id.).  Plaintiff testified that she has a thyroid problem, which causes her to have high blood pressure and high blood sugar.  (Tr. 465).  Plaintiff's attorney noted that many people with thyroid problems experience fatigue.  (Id.).  Plaintiff testified that she is tired the majority of the time.  (Id.).  Plaintiff stated that she did not know whether her fatigue was caused by her medications or her thyroid condition.  (Tr. 466).  Plaintiff testified that she wakes up with her son at about 6:00 a.m., sees her son off to school, and then lies down from about 7:30 a.m. to 10:30 a.m.  (Id.).  Plaintiff states that when she gets up at 10:30 a.m., she still feels tired, and that she feels tired and sluggish the majority of the time.  (Id.).

---

[9]Inflammation of a bursa.  Stedman's at 282.

[10]Inflammation of a tendon.  Stedman's at 1944.

Plaintiff testified that she was diagnosed with fibromyalgia.[11]  (Id.).  The ALJ noted that he did not see this diagnosis in the record.  (Id.).  Plaintiff's attorney stated that he only saw one reference to myalgia,[12] rather than fibromyalgia in the record.  (Id.).  Plaintiff testified that a doctor she saw in Cape Girardeau earlier that year told her that she "most probably" had fibromyalgia, but she did not know that doctor's name.  (Tr. 467).  Plaintiff stated that the doctor was a rheumatoid arthritis specialist to whom she was referred by Dr. Monroe, but she did not know the name of the doctor or the clinic.  (Id.).  Plaintiff testified that she only saw this doctor on one occasion and he never told her his name.  (Tr. 468).  Plaintiff stated that Dr. Monroe referred her to this specialist due to her knee pain.  (Id.).  Plaintiff testified that the specialist did not perform any testing, but examined her leg and reviewed x-rays ordered by Dr. Landry.  (Id.).  Plaintiff testified that Dr. Landry told her that her knee pain was caused by arthritis.  (Id.).

Plaintiff stated that she experiences pain in her arms and shoulders, which her doctors believe could be arthritis.  (Tr. 469).  Plaintiff testified that, due to her arthritis, she is unable to walk far distances, and it takes her longer to walk short distances.  (Id.).  Plaintiff stated that she used to be able to walk to town and back in nine minutes, and it now takes her thirty minutes.  (Id.).  Plaintiff testified that she has to stop four or five times to rest when she walks to the library, which is only a few blocks away.  (Id.).

Plaintiff stated that she experiences neck pain and her neck occasionally locks.  (Id.).

---

[11]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution.  Additionally, point tenderness must be found in at least 11 of 18 specified sites.  See Stedman's at 725.

[12]Muscular pain.  Stedman's at 1265.

Plaintiff testified that she is unable to turn her head very far in either direction without experiencing pain.  (Id.).

Plaintiff's attorney noted that plaintiff has a benign mass in her right breast.  (Tr. 470).  Plaintiff testified that she experiences some chest pain as a result of this mass.  (Id.).  Plaintiff stated that she experiences chest pain every day.  (Id.).  Plaintiff testified that she was diagnosed with pleurisy[13] years prior to the hearing, which also causes pain in her ribcage.  (Id.).  Plaintiff stated that her chest pain is severe, causing her to double over, about twice a week.  (Id.).  Plaintiff testified that she experiences this pain when she takes pain medication.  (Id.).

Plaintiff stated that she is able to stand and sit for about thirty minutes before she has to change positions.  (Tr. 471).  Plaintiff testified that she is able to do little things around the house, such as cook or put away dishes, for about an hour as long as she is not standing in one place too long.  (Id.).  Plaintiff stated that she is able to frequently lift no more than five pounds without dropping the object.  (Id.).  Plaintiff testified that she drops objects, such as glasses or bottles, about once a week.  (Tr. 472).  Plaintiff stated that she has problems reaching above her head with her left arm.  (Id.).  Plaintiff testified that she has difficulty bending down due to her back pain.  (Id.).  Plaintiff stated that she has problems climbing up stairs because she experiences left knee pain.  (Id.).

Plaintiff testified that she used braces, which helped with her carpal tunnel syndrome, for about two years.  (Id.).  Plaintiff stated that the braces stopped helping a few months prior to the hearing, so she stopped using them.  (Tr. 473).  Plaintiff testified that her doctors ordered surgery when the braces stopped helping.  (Id.).  Plaintiff stated that she started experiencing more

---

[13]Inflammation of the pleura.  Stedman's at 1512.

problems with her hands and started dropping objects. (Id.).

The ALJ then re-examined plaintiff, who testified that Dr. Landry diagnosed her with arthritis. (Tr. 474). Plaintiff stated that she saw Dr. Landry for at least a year and that he released her from his care in October of 2006. (Id.). Plaintiff testified that the arthritis is mostly in her legs. (Id.). Plaintiff stated that Dr. Monroe referred her to a doctor in Cape Girardeau who examined x-rays of her legs and found that it was probably fibromyalgia rather than arthritis. (Tr. 475). Plaintiff testified that Dr. Landry still believes that she suffers from arthritis. (Id.).

Plaintiff stated that she sleeps from 7:30 a.m. to 10:30 a.m., after her son goes to school. (Id.). Plaintiff testified that after she wakes at 10:30 a.m., she bathes and then prepares lunch. (Id.). Plaintiff stated that after she eats lunch, she sits down in her chair and rests for about a half hour. (Id.). Plaintiff testified that she watches television and rests for the remainder of the day. (Tr. 476). Plaintiff stated that she watches television for a total of about four hours a day. (Id.). Plaintiff testified that she cooks dinner and then spends her evening helping her son with his homework and watching television with her son. (Id.). Plaintiff stated that her husband does the laundry, sweeps, mops, and vacuums. (Id.). The ALJ inquired as to how plaintiff's husband was able to perform these household chores if he is disabled. (Id.). Plaintiff stated that her husband does not perform these chores often. (Id.). Plaintiff testified that her sister takes her shopping and lifts everything for plaintiff. (Id.).

Plaintiff stated that she attends church about once a month. (Tr. 477). Plaintiff testified that she goes to the library twice a week. (Id.). Plaintiff stated that she walks to the library, which is about three blocks from her home. (Id.). Plaintiff testified that she reads about one book a month. (Id.). Plaintiff stated that she uses the computer at the library and that she usually

spends a couple hours at a time using the computer at the library.  (Id.).

The ALJ then examined vocational expert Susan Shea, who testified that plaintiff had no past relevant work because she only worked at positions for two months.  (Tr. 479).  The ALJ asked Ms. Shea to assume a hypothetical worker who is able to lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for up to six hours in an eight-hour day; sit for up to six hours in an eight-hour day; unable to climb ladders or scaffolds; and able to no more than occasionally climb stairs or ramps, kneel, crouch, or crawl.  (Id.).  Ms. Shea testified that such an individual would be able to perform work such as production work (23,000 positions in Missouri), cashiering work (68,000 positions in Missouri), fast food work (14,000 positions in Missouri), and unskilled clerical work, such as callout operator or receptionist (3,000 positions in Missouri).  (Tr. 479-80).

The ALJ next asked Ms. Shea to assume a worker with the following limitations: able to sit for two hours; stand for two hours; sit or stand alternatively for six hours; occasionally bend; rarely squat or crawl; occasionally climb, reach or lift above the shoulders; lift no more than twenty pounds; and no more than occasional grasping, pushing or pulling with the upper extremities, fine manipulation and foot controls.  (Tr. 480).  The ALJ noted that he obtained this hypothetical from an exhibit and acknowledged that it was confusing.  (Id.).  Ms. Shea indicated that she was confused by the alternate sit and stand for six hours limitations.  (Tr. 481).  Ms. Shea testified that the only work that would be possible with these limitations would be the unskilled clerical work.  (Id.).

The ALJ then posed a third hypothetical with the following limitations: able to lift and carry ten pounds; no more than occasional overhead reaching with the non-dominant arm; able to

sit six hours of an eight-hour day with normal breaks; stand and walk two hours out of an eight-hour day; no climbing; no more than occasional stooping, kneeling, or crouching; less than occasional grasping, forceful grasping; and no more than occasional fingering. (Tr. 481). Ms. Shea testified that the hypothetical individual would not be able to perform any work with these limitations. (Id.).

Plaintiff's attorney then examined Ms. Shea. (Tr. 482). Plaintiff's attorney asked Ms. Shea to add the following limitation to hypothetical number two: when sitting, the claimant would need to keep her legs elevated to a height of at least two feet. (Id.). Ms. Shea testified that this limitation would eliminate the work discussed regarding hypothetical number two. (Id.). Plaintiff's attorney next asked Ms. Shea to add the following limitation to the original hypothetical number two: claimant is unable to repetitively use her hands and would frequently drop items. (Id.). Ms. Shea testified that this limitation would eliminate the work previously discussed. (Id.).

The ALJ indicated that he would leave the record open so that plaintiff's attorney could attempt to obtain the medical records from the unknown source. (Tr. 483).

**B.    <u>Relevant Medical Records</u>**

The record reveals that plaintiff received treatment from Lance E. Monroe, M.D. at Paragould Doctors' Clinic for various complaints including chest pain, hypertension, thyroid mass, obesity, migraines, knee pain, and joint pain from February 1998 through August 2006. (Tr. 157-219, 283-399). Plaintiff was treated with medication.

On July 2, 2004, plaintiff complained of muscle spasms in her stomach; neck, arm, leg, and back pain; and migraines. (Tr. 373). Plaintiff had a new complaint of her hands going numb. (Id.). Dr. Monroe noted that plaintiff's "mental condition has been stable." (Id.). Dr. Monroe

stated that plaintiff had been doing well and that plaintiff indicated that her pain was under control with her present treatment.  (Id.).  Plaintiff weighed 270 pounds.  (Id.).  Upon examination, plaintiff's gait and station were normal.  (Tr. 374).  Dr. Monroe diagnosed plaintiff with bilateral carpal tunnel syndrome.  (Id.).  Plaintiff continued to have diagnoses of thyroid mass, benign essential hypertension,[14] obesity, arthralgia,[15] and migraine.  (Id.).  Dr. Monroe prescribed Synthroid,[16] Loratadine, Norvasc, Naproxen, and wrist splints for the carpal tunnel syndrome. (Id.).

On October 1, 2004, plaintiff complained of "hurting all over."  (Tr. 369).  Plaintiff had a new complaint of muscle spasm.  (Tr. 370).  Dr. Monroe's assessment was chest pain, improved; benign essential hypertension, unchanged; obesity, unchanged; arthralgia, deteriorated.  (Tr. 370).

On November 1, 2004, plaintiff complained of vaginal bleeding for two weeks.  (Tr. 160). Dr. Monroe diagnosed plaintiff with excessive menstruation.  (Tr. 366).  Plaintiff continued to complain of excessive menstruation on December 17, 2004 and January 17, 2005.  (Tr. 362, 353).

Plaintiff presented to Roger Cagle, M.D. on January 27, 2005, with complaints of left ear pain and headaches.  (Tr. 251).  Plaintiff reported smoking one-half package of cigarettes a day. (Id.).

Plaintiff presented to Robert S. Hunt, M.D. on March 2, 2005, with complaints of nipple discharge.  (Tr. 259).  Dr. Hunt's impression was history of nipple discharge in the right breast,

---

[14]High blood pressure without known cause that runs a relatively long and symptomless course.  See Stedman's at 927.

[15]Pain in a joint.  Stedman's at 159.

[16]Synthroid is indicated for the treatment of hypothyroidism.  See PDR at 515.

probably not pathologic.  (Id.).  Dr. Hunt recommended bilateral mammograms and ultrasounds.  (Tr. 260).  Plaintiff underwent a mammogram and ultrasounds, which revealed a benign mass.  (Tr. 255-57).

On April 13, 2005, plaintiff presented to Dr. Monroe for a follow-up regarding her thyroid.  (Tr. 350).  Dr. Monroe diagnosed plaintiff with multinodular goiter[17] and a urinary tract infection.  (Tr. 351).  Plaintiff returned for a follow-up on May 27, 2005, at which time her diagnoses remained unchanged.  (Tr. 346-48).

Plaintiff saw Dr. Cagle on July 14, 2005, with complaints of bilateral knee pain.  (Tr. 249).  Plaintiff reported smoking one-half package of cigarettes a day.  (Id.).  Plaintiff's physical examination was normal.  (Tr. 250).  Dr. Cagle diagnosed plaintiff with hypothyroidism,[18] benign hypertension, knee joint pain, and wrist pain.  (Id.).

Plaintiff presented to Jennie Bourne RN ANP on July 21, 2005, with complaints of bilateral knee pain.  (Tr. 292).  Upon physical examination, plaintiff had full range of motion with mild patella crepitation and hamstring tightness.  (Id.).  Ms. Bourne's assessment was bilateral knee pain and swelling with very minimal arthritis of both knees.  (Id.).  It was recommended that plaintiff undergo an MRI of both knees.  (Id.).

Plaintiff underwent x-rays of both knees on July 21, 2005, which revealed no significant abnormalities.  (Tr. 293).

_____

[17]An enlargement of the thyroid gland caused by the growth of several colloid nodules. See Stedman's at 824.

[18]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to gain weight, and somnolence.  Stedman's at 939.

On July 25, 2005, plaintiff underwent an MRI of both knees. (Tr. 222). The MRI of the right knee revealed small joint effusion. (Tr. 223). The MRI of the left knee revealed minimal joint effusion with slight degenerative changes. (Id.).

Plaintiff saw Ms. Bourne on August 4, 2005, for a follow-up regarding the MRI of both knees. (Tr. 291). Ms. Bourne's assessment was beginning arthritis of the left knee and a small joint effusion or synovitis[19] of the right knee. (Id.). Plaintiff was given a cortisone injection into the left knee. (Id.). On August 11, 2005, plaintiff reported that the injection provided eighty percent improvement and requested another injection. (Tr. 290). Plaintiff underwent another injection to the right knee. (Id.). On September 1, 2005, Ms. Bourne prescribed Ultram.[20] (Tr. 289).

On October 4, 2005, plaintiff complained of chest, neck, leg, arm, back, and shoulder pain. (Tr. 183). Plaintiff also complained of fatigue. (Id.). Dr. Monroe's assessment was chest pain, improved; benign essential hypertension, unchanged; thyroid mass, unchanged; obesity, unchanged; arthralgia, deteriorated; bilateral carpal tunnel syndrome, unchanged; and multinodular goiter, unchanged. (Tr. 343). Dr. Monroe listed myalgia as a "new problem." (Id.). Dr. Monroe assessed abnormal blood chemistry and noted uncontrolled type II diabetes mellitus[21]

---

[19]Inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis. Stedman's at 1920.

[20]Ultram is an analgesic indicated for the management of moderate to moderately severe pain in adults. See PDR at 2553.

[21]Diabetes mellitus is a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced. It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma. See Stedman's at 529. Type II diabetes is characterized by high blood glucose levels caused by either a lack of insulin or the body's inability

as a new problem.  (Tr. 340).  November 18, 2005, Dr. Monroe noted that plaintiff's diabetes had improved.  (Tr. 337).

Dr. Monroe completed an Endocrine System Evaluation on October 4, 2005.  (Tr. 157-62).  Dr. Monroe indicated that plaintiff demonstrated the following symptoms: nervousness, restlessness, heat intolerance, increased sweating, fatigue, muscle weakness, eye irritation, frequent bowel movements, menstruation irregularities, goiter, sleeping difficulty, clammy skin, blushing skin, high blood pressure, weight gain, depression, joint or muscle pain, thin fingernails, muscle spasms, and joint stiffness.  (Tr. 158).  Dr. Monroe expressed the opinion that plaintiff was able to sit for two hours; stand for two hours; sit or stand alternatively for six hours; walk for less than two hours; occasionally bend, climb, and reach or lift above her shoulders; and rarely squat or crawl.  (Tr. 159).  Dr. Monroe found that plaintiff's ability to perform simple grasping with her hands, push, pull, perform fine manipulations with her hands, and use foot controls with her feet were limited.  (Id.).  Dr. Monroe indicated that plaintiff suffers from sleep disturbance, which affects her ability to function physically and mentally.  (Id.).  Dr. Monroe found that plaintiff had mild limitation of her peripheral vision after correction.  (Id.).  Dr. Monroe noted that plaintiff exhibited symptoms of depression and anxiety, which contributed to the severity of her functional limitations.  (Tr. 160-61).  Dr. Monroe found that plaintiff's symptoms frequently interfered with her attention and concentration to perform work tasks and that plaintiff was not capable of handling work-related stress.  (Tr. 161).  Dr. Monroe noted that plaintiff would need to take frequent unscheduled one-hour breaks during an eight-hour workday, and that plaintiff would need to elevate her legs.  (Id.).  Dr. Monroe concluded that plaintiff was unable to work.  (Tr.

_____

to use insulin efficiently; it develops most often in middle-aged and older adults.  Id. at 530.

162).

In a note dated December 2, 2005, Dr. Monroe's office indicated that plaintiff had an appointment scheduled with Dr. Phillip Taylor in Cape Girardeau on December 22, 2005. (Tr. 333).

Plaintiff presented to Physician Associates on December 22, 2005, upon the referral of Dr. Monroe, for evaluation of back and neck pain. (Tr. 437-38). Plaintiff complained of low back pain that did not radiate into her legs, which began about three years prior. (Tr. 437). Plaintiff also complained of a little pain in her neck and her left shoulder, and in her hands and knees. (Id.). Upon physical examination, plaintiff had no limitation of motion, pain on motion, crepitation, subluxation or effusion of any joint in either of the upper or lower extremities. (Id.). Tender zones were noted over the lateral elbows along the trapezius muscles and back and on the medial knees. (Id.). The impression of the examining physician, presumably Dr. Taylor,[22] was: "Three-year history of pain in the back, neck, left posterior shoulder, hands, and knees are probably due to fibromyalgia. The patient does sleep poorly and has headaches and tender zones." (Tr. 433). It was recommended that plaintiff stop Tizanidine and start Flexeril.[23] (Id.).

On January 20, 2006, plaintiff presented for diabetes management. (Tr. 328). Plaintiff complained of headache and musculoskeletal symptoms. (Id.). Dr. Monroe noted that plaintiff understood dietary principles but was not following the appropriate diet or exercising. (Id.). There were no symptoms to suggest diabetic complications. (Id.). Dr. Monroe's impression was

---

[22]The treatment note is not signed by a physician.

[23]Flexeril is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

- 15 -

uncontrolled type II diabetes mellitus, and benign essential hypertension. (Tr. 330). Dr. Monroe prescribed Flexeril and Lisinopril. (Tr. 331).

Plaintiff presented to Dr. Monroe for a follow-up on April 18, 2006, at which time she reported pain in her hands and fingers. (Tr. 322). Dr. Monroe's impression was bilateral carpal tunnel syndrome, and uncontrolled type II diabetes mellitus. (Tr. 325). Dr. Monroe ordered a nerve conduction study. (Id.).

Plaintiff underwent a nerve conduction study on April 27, 2006, which revealed mild to moderately severe right carpal tunnel syndrome, mild left carpal tunnel syndrome, and a normal nerve conduction study of the bilateral ulnar nerves. (Tr. 441).

On July 18, 2006, plaintiff complained of numbness in both hands, neck pain, headaches, and dizziness. (Tr. 318). Plaintiff reported that her carpal tunnel syndrome was worse and that she was using splints. (Id.). Dr. Monroe noted that plaintiff was not following her diet, not performing foot exams, and not exercising regularly. (Id.). Dr. Monroe noted the presence of the diabetic complication of paresthesias.[24] (Id.). Dr. Monroe's impression was bilateral carpal tunnel syndrome and uncontrolled type II diabetes mellitus. (Tr. 320). Dr. Monroe encouraged plaintiff to diet and exercise. (Id.). He referred plaintiff to an orthopedist for her hands. (Id.).

Plaintiff presented to Edmund Landry, M.D. on July 27, 2006, with complaints of bilateral hand pain and numbness and tingling for the past few years. (Tr. 285). Dr. Landry noted that plaintiff had osteoarthritis of the knees. (Id.). Plaintiff reported that she tried night splints without benefit and underwent nerve conduction studies, which revealed bilateral carpal tunnel

---

[24]A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking). Stedman's at 1425.

syndrome.  (Id.).  Upon physical examination, plaintiff had full range of motion of the neck and shoulders.  (Id.).  Dr. Landry indicated that he would not attempt further treatment until he obtained the nerve conduction studies.  (Tr. 286).  He also recommended that plaintiff undergo a cervical MRI to rule out a neck lesion.  (Id.).

Plaintiff underwent x-rays of the cervical spine on July 27, 2006, which revealed muscle spasm.  (Tr. 288).  Plaintiff underwent an MRI of the cervical spine on August 2, 2006, which revealed no significant abnormalities.  (Tr. 287).

Plaintiff presented to Dr. Landry for a follow-up regarding bilateral upper extremity pain, numbness, and tingling on August 10, 2006.  (Tr. 284).  Dr. Landry noted that plaintiff also complained of neck pain and left knee pain.  (Id.).  Dr. Landry stated that plaintiff had arthritis of the left knee and increased joint pain.  (Id.).  Upon physical examination, Dr. Landry noted tenderness at the lateral joint line of the left knee.  (Id.).  Dr. Landry noted that nerve conduction studies plaintiff underwent in April 2006 revealed bilateral carpal tunnel syndrome, worse on the right than the left.  (Id.).  Dr. Landry administered a cortisone injection to the right carpal canal. (Id.).

On August 22, 2006, plaintiff presented to Dr. Monroe requesting surgery clearance.  (Tr. 312).  Dr. Monroe noted that plaintiff was scheduled to undergo carpal tunnel surgery on September 1, 2006.  (Id.).  Dr. Monroe cleared plaintiff for surgery.  (Tr. 315).

Dr. Landry performed right carpal tunnel release surgery on September 1, 2006.  (Tr. 403-04).

### The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since August 1, 2003.

2.  The medical evidence establishes that the claimant has osteoarthritis of the knees, carpal tunnel syndrome, and obesity, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3.  Although the claimant has some pain and fatigue, the claimant's allegations of disabling pain and fatigue are not credible for the reasons enumerated in the decision.

4.  The claimant has the residual functional capacity to perform the physical exertion involving standing and walking for six hours out of eight hours with usual breaks, sitting for six hours out of an eight hour workday with usual breaks, frequent lifting up to ten pounds, and occasional lifting up to twenty pounds, and the non-exertional requirements of work, involving no climbing of ladders and scaffolds, only occasionally using stairs or ramps, kneeling crouching, and crawling, and no repetitive pushing and pulling, fine manipulations, or use of foot controls.

5.  The claimant has no relevant work history.

6.  The claimant's residual functional capacity for the full range of light work is reduced by the non-exertional limitations enumerated in finding No. 4.

7.  The claimant is 36 years old, which is defined as a younger age individual.

8.  The claimant graduated from high school and completed two years of college.

9.  The claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work.

10. Based on the exertional capacity for light work, and the claimant's age, education, and work experience, Section 416.969 of Regulations No. 16 and Rule 202.20, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 directs a conclusion of "not disabled."

11. Although the claimant's additional non-exertional limitations do not allow her to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national economy which she could perform. Examples of such jobs are: call-out operator and receptionist of which there are 3,000 such jobs in the state of Missouri.

12. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 17-18).

The ALJ's final decision reads as follows:

> It is the decision of the Administrative Law Judge that, based on the application filed on July 7, 2005 (protective filing date), the claimant is not eligible for Supplemental Security Income under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 18).

## Discussion

### A.  Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).


C.      **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining that plaintiff's impairments did not meet or equal a listing.  Plaintiff next argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation.  Plaintiff contends that the ALJ erred in

evaluating the medical evidence.  Plaintiff next argues that the ALJ erred in determining plaintiff's

residual functional capacity.  Finally, plaintiff contends that the hypothetical question the ALJ

posed to the vocational expert was erroneous.  The undersigned will address plaintiff's claims in

turn.

**1.      Listings**

Plaintiff argues that the ALJ erred in failing to discuss whether plaintiff's impairments met

or equaled a listing.  Plaintiff contends that the ALJ should have considered the listings for

hypothyroidism, migraines, and carpal tunnel syndrome.

The burden of proof is on the plaintiff to establish that his or her impairment meets or

equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an

impairment must meet all of the listing's specified criteria.  Id.  An impairment that manifests only

some of these criteria, no matter how severely, does not qualify.  Id. (quoting Sullivan v. Zebley,

493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)).  Although it is preferable that

ALJs address a specific listing, failure to do so is not reversible error if the record supports the

overall conclusion.  Pepper ex rel Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

In this case, the ALJ did not discuss any of the individual listings.  The ALJ stated in his

findings that plaintiff did not have an impairment or combination of impairments listed in or

medially equal to a listed impairment.  (Tr. 17).  Plaintiff does not contend that her impairments in

fact met any of the listed impairments and the evidence does not support such a finding.  Rather,

plaintiff merely argues that the ALJ should have discussed the individual listings.  Although it

would have been preferable for the ALJ to address specific listings, the ALJ's failure to do so

does not constitute reversible error.  See Pepper ex rel Gardner, 342 F.3d at 855.

## 2.    **Credibility Analysis**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Specifically, plaintiff contends that the ALJ failed to follow the criteria set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski, 739 F.2d at 1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible

when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, although the ALJ did not cite Polaski, he properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 17). The ALJ first stated that plaintiff does not have a good work history. (Id.). The ALJ noted that plaintiff has not worked at any job since 1997. (Id.). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). A poor work history prior to the alleged onset of disability lessens the credibility of a plaintiff's allegations of disabling pain. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).

The ALJ next noted that Dr. Monroe's notes reveal that plaintiff was not following her diet as advised to do. (Tr. 17, 328, 318). Plaintiff had not attempted a weight loss or exercise program. (Id.). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003). The ALJ properly found that plaintiff's failure to follow a prescribed diet and exercise program detracted from her credibility.

The ALJ pointed out that, although plaintiff testified that she has never smoked, plaintiff told Dr. Cagle that she smoked one-half package of cigarettes daily. (Tr. 17, 249, 251). The ALJ found that plaintiff's inconsistent statements detracted from her credibility.

The ALJ next discussed plaintiff's daily activities.  The ALJ stated that plaintiff reported that she did laundry, cleaned, cooked meals, and that she enjoyed reading, sewing, and watching television.  (Tr. 17).  Plaintiff also testified that she regularly walked three blocks to the library to use the computer.  (Id.).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  As such, the ALJ properly determined that plaintiff's ability to engage in these activities on a regular basis appears inconsistent with the inability to work.

Finally, the ALJ stated that there is no evidence of significant adverse side effects from plaintiff's medications.  (Tr. 17).  The presence or absence of side effects is a proper Polaski factor.  See Polaski, 739 F.2d at 1322.

An administrative opinion must establish that the ALJ considered the appropriate factors.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

## 3.   Evaluation of Medical Evidence

Plaintiff argues that the ALJ erred in evaluating the medical evidence.  Specifically, plaintiff contends that the ALJ failed to give proper weight to the opinion of treating physician Dr. Monroe.  Plaintiff also argues that the ALJ ignored plaintiff's fibromyalgia, obesity, back pain,

migraines, bilateral carpal tunnel syndrome, thyroid disorder, and knee condition.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Dr. Monroe completed an Endocrine System Evaluation on the October 4, 2005. (Tr. 157-62). Dr. Monroe expressed the opinion that plaintiff was able to sit for two hours; stand for two hours; sit or stand alternatively for six hours; walk for less than two hours; occasionally bend, climb, and reach or lift above her shoulders; and rarely squat or crawl. (Tr. 159). Dr. Monroe did not include any lifting or carrying limitations in his opinion. He found that plaintiff's ability to perform simple grasping with her hands, push, pull, perform fine manipulations with her hands, and use foot controls with her feet were limited. (Id.). Dr. Monroe noted that psychological

factors contributed to the severity of plaintiff's functional limitations. (Tr. 160-61). Dr. Monroe concluded that plaintiff was unable to work. (Tr. 162).

The ALJ discussed Dr. Monroe's opinion. (Tr. 16). The ALJ stated that the medical record as a whole did not support Dr. Monroe's finding of disability. (Id.). The ALJ noted that, although Dr. Monroe indicated that plaintiff's psychological symptoms contributed to the severity of her limitations, the record does not reveal the presence of an emotional impairment having any more than a minimal effect on plaintiff's ability to work. (Id.). The ALJ pointed out that plaintiff's mood and affect were generally reported to be normal and plaintiff has not required medication or psychiatric care for any mental impairment. (Id.).

The ALJ found that the record did demonstrate that plaintiff was physically restricted in her capacity to work. The physical restrictions provided by Dr. Monroe, however, are internally inconsistent. Dr. Monroe found that plaintiff was able to sit for only two hours and stand for only two hours, but that she was able to sit or stand alternatively for six hours, and walk for less than two hours. (Tr. 159). The ALJ pointed out these inconsistencies during the hearing when questioning the vocational expert. (Tr. 480). Where a treating physician's opinion is itself inconsistent, it should be accorded less deference. Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

The undersigned finds that the ALJ properly discounted the conclusions of Dr. Monroe. As noted by the ALJ, Dr. Monroe's opinion was internally inconsistent and inconsistent with the record as a whole. The record does not support the presence of a severe mental impairment. Further, the medical record, including Dr. Monroe's own treatment notes, does not support Dr. Monroe's conclusion that plaintiff is not capable of performing any work.

Plaintiff also contends that the ALJ ignored plaintiff's fibromyalgia, obesity, back pain, migraines, bilateral carpal tunnel syndrome, thyroid disorder, and knee condition. This argument lacks merit. First, with regard to fibromyalgia, the ALJ found that no definite diagnosis of fibromyalgia had been established. (Tr. 16). This finding is supported by the record. The only mention of fibromyalgia was made by the Physician Associates doctor who examined plaintiff one time, on December 22, 2005. (Tr. 437-38). Upon physical examination, plaintiff had no limitation of motion, pain on motion, crepitation, subluxation or effusion of any joint in either of the upper or lower extremities. (Id.). Tender zones were noted over the lateral elbows along the trapezius muscles and back and on the medial knees. (Id.). The impression of this physician was that plaintiff's pain was "probably due to fibromyalgia." (Tr. 433). There is no other mention of fibromyalgia in the record. Further, the Physician Associates physician did not indicate that testing revealed tenderness in at least eleven of eighteen sites, which is necessary for a diagnosis of fibromyalgia.[25] Thus, the ALJ properly considered the evidence of fibromyalgia and determined that this diagnosis was not established.

Although plaintiff contends that the ALJ ignored her obesity, the ALJ found that plaintiff's obesity was a severe impairment and considered it in making his determination. (Tr. 17). Significantly, plaintiff did not allege obesity as an impairment in her application for benefits. Plaintiff also does not indicate what additional restrictions her obesity causes that were not found by the ALJ.

Similarly, the ALJ found that plaintiff's osteoarthritis of the knees and carpal tunnel syndrome were severe impairments. (Tr. 17). The ALJ noted that plaintiff had undergone carpal tunnel release surgery. The ALJ also pointed out that plaintiff was able to use her hands for fine

---

[25]See Stedman's at 725.

manipulation to use the computer on a regular basis. (Tr. 17). The ALJ took these impairments into consideration when formulating plaintiff's residual functional capacity.

With regard to plaintiff's back pain and migraines, the ALJ acknowledged that plaintiff suffers from some pain and fatigue, but found plaintiff's allegations of disabling pain were not credible. (Tr. 18). The ALJ also noted that MRI scans of the cervical spine and lumbar spine have demonstrated no significant abnormalities. (Tr. 16).

The ALJ also acknowledged plaintiff's thyroid disorder and discussed the results of a thyroid scan. (Tr. 14). Plaintiff takes medication to control this disorder. There is no evidence that plaintiff has any additional functional limitations due to this disorder.

Thus, the ALJ properly evaluated the medical evidence of record.

## 4.  Residual Functional Capacity

Plaintiff next claims that the ALJ erred in determining her residual functional capacity. Specifically, plaintiff argues that the ALJ erred in finding plaintiff was capable of performing the full range of light work.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may

consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

The claimant has the residual functional capacity to perform the physical exertion involving standing and walking for six hours out of eight hours with usual breaks, sitting for six hours out of an eight hour workday with usual breaks, frequent lifting up to ten pounds, and occasional lifting up to twenty pounds, and the non-exertional requirements of work, involving no climbing of ladders and scaffolds, only occasionally using stairs or ramps, kneeling, crouching, and crawling, and do no repetitive pushing and pulling, fine manipulations, or use of foot controls.

(Tr. 18).

Although plaintiff contends that the ALJ erred in determining that plaintiff was capable of performing the full range of light work, the ALJ did not make this finding. Rather, the ALJ found that plaintiff's ability to perform the full range of light work was reduced by non-exertional limitations. (Tr. 18). Specifically, the ALJ determined that plaintiff was unable to climb ladders and scaffolds; could only occasionally use stairs or ramps, kneel, crouch and crawl; and was unable to do repetitive pushing and pulling, fine manipulations, or use foot controls. (Id.). The undersigned finds that the residual functional capacity formulated by the ALJ is supported by substantial evidence. There is no credible evidence of any greater limitations than those found by the ALJ. The ALJ properly discredited the opinion of Dr. Monroe and based his determination on the record as a whole.

## 5.    Vocational Expert Testimony

Plaintiff argues that the ALJ erred in his use of vocational expert testimony. Specifically, plaintiff contends that none of the hypothetical questions posed to the vocational expert were identical to the residual functional capacity formulated by the ALJ.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a vocational expert must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). See also Swope v. Barnhart, 436 F.3d 1023, 1025 (8th Cir. 2006). "If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998).

In the first hypothetical question posed to the vocational expert, the ALJ set out the following restrictions: able to lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for up to six hours in an eight-hour day; sit for up to six hours in an eight-hour day; unable to climb ladders or scaffolds; and able to no more than occasionally climb stairs or ramps, kneel, crouch, or crawl. (Tr. 479). The vocational expert found that such an individual could perform work with these limitations. (Tr. 479-80). As plaintiff points out, this hypothetical question did not include the limitations found in the ALJ's residual functional capacity of no repetitive pushing and pulling, fine manipulations, or use of foot controls. (Tr. 18).

In the second hypothetical question posed to the vocational expert, the ALJ provided the following limitations: able to sit for two hours; stand for two hours; sit or stand alternatively for six hours; occasionally bend; rarely squat or crawl; occasionally climb, reach or lift above the shoulders; lift no more than twenty pounds; and no more than occasional grasping, pushing or pulling with the upper extremities, fine manipulation and foot controls. (Tr. 480). The vocational

expert testified that such an individual was capable of performing unskilled clerical work. (Tr. 481).

The residual functional capacity formulated by the ALJ contains limitations found in the first and second hypothetical questions. Neither of these hypothetical questions, however, contain the *no* repetitive pushing and pulling, fine manipulation, or use of foot controls restrictions found in the residual functional capacity. In the second hypothetical, it was noted that the claimant could perform *no more than occasional* grasping, pushing or pulling with the upper extremities, fine manipulation and foot controls. Plaintiff contends that, when the *no* repetitive pushing and pulling, fine manipulation, or use of foot controls restriction found in the ALJ's residual functional capacity was added to the second hypothetical by plaintiff's attorney, the vocational expert testified that all jobs were eliminated. The hypothetical to which plaintiff refers, was a limitation of "claimant is unable to repetitively use her hands and would frequently drop items." (Tr. 482). Although this is not the exact limitation found by the ALJ in his residual functional capacity, it is similar enough to raise doubts as to whether plaintiff would be able to perform any work with the limitations found by the ALJ.

The restriction of no repetitive pushing and pulling, fine manipulation, or use of foot controls is supported by substantial evidence. Plaintiff has these limitations due to her bilateral carpal tunnel syndrome, for which she has undergone surgery. The hypothetical questions posed to the vocational expert did not contain this restriction and, therefore, did not contain all of plaintiff's limitations. As such, the vocational expert's responses did not constitute substantial evidence to support the ALJ's conclusion of no disability. Thus, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to pose a hypothetical question to the vocational expert that contains all of plaintiff's limitations.

**<u>Conclusion</u>**

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence because the ALJ did not pose a proper hypothetical question to the vocational expert. For this reason, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __28th__ day of September, 2009.

_Lewis M. Blanton_
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE